**UNITED STATES v. ROHLEDER, et al.**
(two cases).

Nos. 9093, 9123.

Circuit Court of Appeals, Third Circuit.

Argued May 23, 1946.

Decided Aug. 15, 1946.

J. Gregory Bruce, of Washington, D. C., (John F. Sonnett, Asst. Atty. Gen., and Gerald A. Gleeson, U. S. Atty., and Thomas J. Curtin, Asst. U. S. Atty., both of Philadelphia, Pa., and Joseph M. Friedman, Chief, War Frauds Civil Section, of Wash-

ington, D. C., on the brief), for the United States.

James F. Masterson, of Philadelphia, Pa., (G. Fred Di Bona, of Philadelphia, Pa., on the brief), for defendants.

Before MARIS, GOODRICH and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is a civil suit brought by the United States under Sections 3490–3492 inclusive, and Section 5438 of the Revised Statutes, 31 U.S.C.A. §§ 231–233, 18 U.S.C.A. §§ 80, 82–86, to recover the forfeitures and double damages provided by Section 3490 for submitting false claims for materials supplied as a subcontractor on a Navy shipbuilding project.[1] The government offered no evidence of actual damage at the trial and sought only to recover the statutory forfeitures. The case was tried without a jury. The District Judge found that the defendants had violated Section 3490 as to the sixteen contracts involved. He assessed the statutory penalty of $2,000 against the defendants on each of the contracts. From the judgment entered therein the defendants appeal. The government, claiming that each of the ninety purchase orders in the matter called for a separate forfeiture, cross appeals on that point.

The defendant, Charles F. Rohleder, is a building contractor in Philadelphia; the other defendants were employed by him as his agents and carried on with him the activities described below. Rohleder entered into subcontracts with the Cramp Shipbuilding Company, which was under contract with the Navy Department. This main contract between Cramp and the Navy, dated October 29, 1940 (designated NOD 1550), obligated Cramp to improve its shipyards in Philadelphia by the erection of "Emergency Plant Facilities" preparatory to the building of six light cruisers. The provisions of the contract were that the Cramp Company would, without profit to it, by itself or through contracts with others, make improvements of the value of about $12,000,000. Records and accounts of the project were to be kept by Cramp, and capital for carrying it on was obtained by arrangement with a number of banks. The Navy, represented by the Supervisor of Shipbuilding at the Cramp plant, had broad rights of inspection of work and records during and after construction. The Supervisor's approval was required in advance for all plans, prices, subcontractors and subcontracts involved. At the completion of the work, a Final Cost Certificate would be presented by Cramp to the Navy, which would then reimburse

---

[1] Section 3490 of the Revised Statutes, 12 Stat. 696, reads as follows: "Sec. 3490. Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall do or commit any of the acts prohibited by any of the provisions of section fifty-four hundred and thirty-eight, Title 'CRIMES,' shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such an act, together with the costs of the suit; and such forfeiture and damages shall be sued for in the same suit."

Section 5438 of the Revised Statutes, 12 Stat. 696, as it appeared at the time of its incorporation in Section 3490, reads as follows: "Sec. 5438. Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, * * * every person so offending in any of the matters set forth in this section shall be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars."

the company from government funds at 1/60 per month.

On the same date as the main contract, Cramp entered into the first of sixteen subcontracts with Rohleder, eight of which are classed as principal and eight as extension of work projects. The ensuing fifteen were concluded at various times up to September 8, 1941, the date of the last one. These subcontracts were for the actual construction, required by NOD 1550, by Rohleder. They were on a cost-plus-fixed-fee basis, the estimated cost being $1,935,179 and the fixed fee being $63,003. All but two of the subcontracts expressly stated that the work involved was let under and was subject to NOD 1550. All but one of the subcontracts required purchases of $100 or over should be approved by Cramp before being placed.[2] All of the subcontracts were approved about the time of execution by the Navy representative.

Before the execution of any of these subcontracts, an authorized Navy representative orally informed some of the Cramp officials that, in order to obtain the approval for purchase of material, there would have to be furnished to him in advance, three or more bids together with the vendor's name and the price submitted by him. This requirement was reduced to memorandum form. The District Court found that the defendants were aware of this requirement and purported to comply with it in connection with purchase orders submitted in their contract work.

The vast majority of such orders submitted by defendants are not questioned. But ninety of them were found by the District Court to contain "three or more bids, one or more of which bids the defendants knew or had cause to know were false, fictitious, and not bona fide competitive bids." The practice as to these of Rohleder, the other defendants, or their subordinates, was to obtain from dealers bids higher than the one it was desired to have accepted, with the understanding that these bids were not seriously made on the part of the dealers. The ninety items so treated were included in work under all sixteen of the contracts. The bids involved were for-

warded by Rohleder to the Cramp Company and approved without suspicion by it. They were sent to the Navy representative who upon inspection and in reliance on the facts presented gave the final approval, also without suspicion. Rohleder was then provided with copies of the correspondence between Cramp and the Navy, indicating the approved bid. This method was followed for each of the ninety items, and for each of them Rohleder was reimbursed by Cramp. In some instances, the material upon which the bids were given had been installed by Rohleder before the approval procedure got under way. The prices thus obtained were reflected in the Final Cost Certificate submitted by Cramp and paid by the United States through the Navy Department under the terms of NOD 1550.

The Court below also found that "No evidence of any damage suffered by the United States as a result of the alleged illegal acts was offered," and that there "is no evidence * * * that the government would have saved any money had genuine * * * bids * * * been submitted." It appears in the record that the defendants were acquitted of the related criminal action in 1943.

The defendants contend that there can be no recovery under Section 3490 unless actual damages, pecuniary or proprietary, are alleged and proved. They argued that as Section 5438 stood at the time it was incorporated into Section 3490, it required pecuniary loss in order that a conviction be sustained. The question is not wholly free from doubt. It is somewhat complicated by the circumstances that Section 5438 was amended in 1918 among other particulars not presently important by inclusion of the phrase "or for the purpose and with the intent of cheating or swindling or defrauding the Government of the United States." United States v. Cohn, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616, was decided under the 1918 amendment and the Supreme Court specially stressing the above amendment language held that actual loss to the government was necessary to sustain a conviction. Capone v. United States, 7 Cir., 51 F.2d 609, and United

---

[2] In that one the amount was $200.

States ex rel. Starr v. Mulligan, 2 Cir., 59 F.2d 200, are much to the same effect.

Section 5438 was further amended in 1934. The important changes for our purposes were, the dropping of the above quoted part of the 1918 amendment and the addition of the clause "in any matter within the jurisdiction of any department or agency of the United States * * *." That last amendment was considered by the Second Circuit in United States v. Mellon, 96 F.2d 462, on the contention that there could be no violation of the statute without pecuniary loss to the government. The Court said 96 F.2d at page 463: "Before the amendment of 1934 the scope of the statute was, indeed, so limited. United States v. Cohn, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616; United States ex rel. Starr v. Mulligan, 2 Cir., 59 F.2d 200." It is particularly noted that the Court is there referring to Section 5438 with the 1918 "defrauding" phrase relied on in the Cohn opinion and not to the original Section 5438 as it was incorporated into Section 3490. Love v. Mantz, 8 Cir., 72 F.2d 631, does not answer the question either, as the Court there applied the rule of the above cases under the 1918 amendment to indicate that pecuniary loss was a vital element of the claim.

Closest to the present situation is United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443, rehearing denied 318 U.S. 799, 63 S.Ct. 756, 87 L.Ed. 1163. That was a civil suit by an informer under Sections 3490–3494, 31 U.S.C.A. §§ 231–235. The District Judge correctly held that it must rest on violations of Section 5438 as that section read when it was incorporated in Section 3490. United States v. Hess, D.C.W.D.Pa., 41 F.Supp. 197, 205. This is conceded by both sides in this appeal. In the Hess case, just as here, the government asked for forfeitures on items, among others, for which no damage was shown. The District Judge said as to this, 41 F.Supp. at page 218: "The next reason urged by defendants for a new trial is that the court erred in refusal of defendants' 9th point, which reads as follows: '9. There can be no recovery of any penalty or forfeiture on account of any project in which no actual damages

have been shown.' Section 3490, R.S., expressly provides for a penalty of $2,000, 'and, in addition, double the amount of damages which the United States may have sustained.' This makes it plain that regardless of damages sustained, the United States would still be entitled to recover the penalty. This point refers to instances where the United States withheld payments on account of the discovery of the fraud, so that no actual damage was shown. However, that would not preclude the United States from recovery of the penalty prescribed by Section 3490, R.S.".

The judgment of the District Court including the forfeitures allowed for eight projects as to which no damage had been proven was affirmed by the Supreme Court, supra. The no damage forfeitures were not referred to specifically in the opinion but the concluding paragraph thereof did say [317 U.S. 537, 63 S.Ct. 388], "We have examined the other contentions of the respondents and approve of the disposition of them by the courts below." The petition for rehearing specially called the attention of the Court to the circumstances surrounding the particular eight projects; nevertheless the petition was denied as stated.

In view of the attitude toward just such claims as are before us, by the Supreme Court in the Hess litigation, we conclude that Section 3490 embracing Section 5438 as the latter was when incorporated into Section 3490, permits recovery of a forfeiture thereunder without actual damage being proven.

Defendants' second point is that the defendant Rohleder had no knowledge that the bids were fictitious. It is not challenged by the defendants that in connection with many of the ninety purchase orders the material had already been purchased or contracted for and actually used prior to Rohleder's sending in the supposedly competitive bids. A letter in evidence admittedly dictated by Rohleder but never mailed, as the Trial Judge said, "indicates that he was familiar with and had himself engaged in the practice of giving complimentary bids in order to comply with contract requirements for competitive bidding." The Trial Court further said, "The bids

were obtained by his [Rohleder's] agents for his sole benefit and to the extent that their conduct imposes liability, he is answerable for it." Defendants question this last quoted finding as not in accord with established principles of agency law but cite no cases to sustain the proposition. Under the circumstances the Court's statement was proper. United States v. Van Riper, 3 Cir., 154 F.2d 492. Even without the agency inference there is sufficient evidence to warrant the District Judge deciding that Rohleder knew the bids being submitted were not bona fide.

The defendants next urge that the Navy had no authority to demand competitive bids. The main contract between the Navy and Cramp, Article 1, Section 3, Paragraph 5, provided: "Provided, however, that none of the items of the Emergency Plant facilities shall be acquired or constructed unless the approval of the Department (which for this purpose shall be represented by the Supervisor of Shipbuilding at the plant of the Contractor) shall have first been obtained to the plans and specifications therefor, the purchase price thereof, the subcontractor, supplying or constructing the same, and the terms of any subcontract made by the Contractor therefor."

On October 28, 1940, Lieutenant Bishop, acting for the Navy, requested competitive bids. The Navy-Cramp contract was entered into on October 29, 1940, and that same day the first Cramp-Rohleder agreement was approved. While there was no competitive bidding clause in this or any of the later agreements, all but two of them contained statements that the work under them was subject to the Navy-Cramp contract. The procedure of submitting competitive bids was accepted by Rohleder and ostensibly followed by him throughout his work. There was no indication from him to the Navy or to Cramp that would in any way suggest otherwise. It was testified to that such method was fundamental Navy procedure. Considering the nature of the cost-plus-fee contract Rohleder had, the day to day differentiation in amounts of labor and materials required and the necessity that Rohleder's prices had to be approved by the Supervisor of Shipbuilding under the terms of the parent agreement, we agree with the Trial Judge that the Navy requirement of competitive bids was reasonable practice and within the scope of the above quoted paragraph of the Navy-Cramp agreement.

Defendants' final point is devoted to excusable circumstances surrounding the undertaking. They refer to the tremendous time pressure, saying that such irregularities as existed were not caused by any ulterior motive but in the all prevailing effort to get the job accomplished. Undoubtedly this element was present. They refer to the defendant Rohleder having completed his part of the rehabilitation of the Cramp Shipyard speedily at three-fifths of the average overhead and to the satisfaction of all concerned. There is considerable force in these assertions, but we cannot go along with the defendants when they designate the common sense Navy method of insisting on three genuine competitive bids as "red tape." Nor can we condone the scheme of paying lip service to the requirement while secretly consumating the ninety purchase orders without actually obtaining such bids. There is testimony in the record that the Supervisor of Shipbuilding had the authority to and on occasion did waive the requirement for competitive bidding when the facts warranted it, but from all that appears no such request was ever made by the defendants.

The government cross appeal is concerned with the question of the number of forfeitures allowed. The District Court awarded the statutory forfeiture of two thousand dollars on each of the eight main contracts and on the eight subcontracts. The government insists that there should be a forfeiture declared on each of the ninety purchase orders. United States ex rel. Marcus v. Hess (supra) is also illuminating on this problem. In that case there were fifty-six distinct P.W.A. projects involved and many hundreds of false forms. On the judgment in favor of the plaintiff, the latter urged that the penalty attach not only to the fifty-six items but to each false affidavit certificate submitted by the defendants. The defendants argued that the entire fifty-

six projects constituted but one act. The District Court found that each project was a single claim. The Supreme Court in its opinion 317 U.S. at page 552, 63 S.Ct. at page 388, 87 L.Ed. 443, upheld this, saying: "The District Court concluded that the lump sum in damages should be assessed for each separate P.W.A. project. Petitioner does not object to this decision and we conclude that under the circumstances of this case each project can properly be counted separately."

The government argues that in Hess the fraud was in the procurement of the contracts whereas in the situation confronting us the fraud arises from the means taken to obtain the approval of the Supervisor of Shipbuilding. That difference does exist but is not enough to avoid the impact of the Hess opinion. There the Supreme Court said 317 U.S. at page 552, 63 S.Ct. at page 388, 87 L.Ed. 443: "The incidence of fraud on each additional project is as clearly individualized as is the theft of mail from separate bags in a post office." Nor do we think that it can be fairly substantiated that the District Court in limiting the forfeiture to the sixteen contracts overlooked the second and third clauses of Section 5438. The fraud was committed with respect to the contracts. The purchase orders were part of those contracts and not definite projects in themselves. They are analogous to the great number of spurious forms in the Hess case which were absorbed into their respective projects. The grouping by the Trial Judge of the ninety purchase orders under their respective contracts generally corresponds to the distinctions made in United States ex rel. Marcus v. Hess, supra. It is reasonable and has a sound basis in the record.

Affirmed.