**UNITED STATES of America,
Plaintiff,**

v.

**Philip L. BORNSTEIN et al.,
Defendants.**

**Civ. A. No. 1141–67.**

United States District Court,
D. New Jersey.

June 26, 1973.

Herbert J. Stern, U. S. Atty., by Carolyn E. Arch, William A. Carpenter, Jr., Asst. U. S. Attys., for plaintiff.

Jack Ballan, Fair Lawn, N. J., for defendant Philip L. Bornstein.

William Rossmoore, Newark, N. J., for defendant Gerald Page.

## OPINION

KITCHEN, District Judge:

The United States brings this civil action pursuant to the provisions of the False Claims Act (Act), 31 U.S.C.A. § 231 et seq., to recover forfeitures and double damages provided for in section 231. Jurisdiction is founded in 31 U.S.C.A. § 232. The matter is before this Court on a stipulation of facts, trial memoranda of law, and oral argument of counsel. Findings of the Court are based on that stipulation.

1. Each radio kit set was to contain the following: Radio transmitter kit; radio receiver kit; power supply kit; radio transformer kit; and a radio accessory kit. The total dollar volume of the contract was $2,096,583.08.

2. The specifications regarding this particular JAN type tube provided as follows:

   3.7.1.1 "JAN" prefix. The designation of all tubes procured under this specification shall bear the prefix "JAN" except that in the case of small tubes (T–6 ½ bulb outline or smaller) the prefix "J" shall be used. Tubes procured under a contract which either permits or requires any changes in any of the conditions or requirements of this specification shall not bear the prefix "JAN" nor any abbreviation thereof. The "JAN" brand is registered under number 504860 by the United States Patent Office and shall be used only on tubes which have passed Government inspection.

   3.7.1.2 Qualification code. The qualification code marking follows the "JAN" prefix. This designation is assigned to

Defendant United National Labs (United), a corporation of the State of New Jersey, was engaged in the business of purchase and sale of electron tubes. Defendant Bornstein was part owner and general manager of United; defendant Page was part owner, vice-president, and manager of sales of that corporation. At all times relevant to this proceeding United was operated and managed by Bornstein and Page.

In August 1962 the United States Signal Supply Agency entered into Supply Contract No. DA–36–039–AMC–01080(E) with Model Engineering and Manufacturing Corp., Inc. (Model), a corporation of the State of Indiana. Model was engaged in manufacturing and building electronic radio equipment and radio sets, and under the contract was to supply radio kit sets [1] to the Department of the Army. The component parts list of this contract specified that Sub-item #1–5–33, to be included in the radio accessory kits, called for:

2 ea. Tube, Electron JAN type 4X150G Per Specifications, MIL. E–1 and TSS MIL. E–1, 302E dated 4/17/57 [2]

the manufacturer for use on all tube types of his manufacture which have passed the qualification tests and have been approved for inclusion on the Qualified Products List. The code-designating letters shall be as listed in Publication NAVSHIPS 900,152. The code-designation shall be used only by the manufacturer to whom it has been assigned and only as a part of the designation on tubes manufactured at the plant to which the qualification approval was granted. In the case of small tubes (see 3.7.1.1), the manufacturer's code designation may be abbreviated by deleting "C" (the indication that the code has been assigned to a commercial organization in the United States or Canada).

   3.7.1.2.1. Tubes not having qualification. Tubes procured under this specification from a source of supply for which no qualification approval has been granted, shall be marked "JAN" followed by the type on the side wall of the base, or on the envelope of metal, loc-in tubes, or other glass tubes, or on the bulb of tubes without bases. The prefix "J", abbreviation for "JAN", shall be used only as

JAN 4X150G electron tubes are manufactured only for use in military equipment. Surplus or obsolete JAN 4X150G tubes may be used commercially even though they were originally manufactured for military use. During all times relevant to this proceeding the only authorized manufacturer of JAN 4X150G tubes was Eitel McCullough, Inc. (Eimac), a corporation of the State of California.[3] Eimac's qualification code,[4] which appeared on all tubes of its origin that had passed certain qualification tests, was CIM. In addition to the branding of JAN-CIM on tubes that passed all of the tests, Eimac imprinted an acceptance code date on each tube. This code date was a four digit number reflecting the year and week of manufacture.

Due to the requirements of the equipment specifications and "JAN" tests the use of a non-"JAN" branded commercial tube or a surplus or obsolete "JAN" branded tube required prior written approval from the Government contracting officer who administered the contract. Model had not obtained such approval and, in fact, certified that the material offered was new, recently manufactured, had never been used, and was not former surplus of any type.

In May, 1963 defendant Page wrote Model advising that United was able to supply JAN 4X150G electron tubes at a price of $32.00 per tube.[5] In that same correspondence Page assured Model that United would test the tubes according to the applicable military specifications and would certify the tubes by Government inspection. Defendants knew that the tubes were for use in the Government contract, even though they had never seen a copy of that agreement.

Pursuant to the above arrangement in July 1963 defendants shipped ten 4X150G tubes to Model for sampling. Following a preliminary inspection of the sample tubes, Model sent a form to United advising of the following facts concerning the tubes:

> no code date
> no JAN marking
> electrically OK
> physically OK
> Decision: accepted

In December 1963 Model issued to United a purchase order for 1008 JAN 4X150G electron tubes at a total cost of $32,256.00 and a unit price of $32.00 per tube. Shortly thereafter United shipped 120 of the subject tubes to Model. In early January 1964, however, Model returned the tubes as unacceptable because they had not been JAN branded or Government source inspected.

Model then became concerned that United might not be able to furnish tubes that met Government specifications and requested United confirm that the correct tubes could be furnished. By letter of January 24, 1964, signed by defendant Bornstein, Model was advised as follows:

> This letter is to stand as affirmation by us that we are fully equipped and capable to delivery (sic) any and all electron tubes and semi-conductors on which we accept purchase orders from you to the applicable military specifications and government source inspection supplied as required.

The defendants then affixed or caused to be affixed to the tubes in their pos-

---

specified in 3.7.1.1. The manufacturer's code name which signifies qualification shall not be used on any part of the tube.

3. Tubes can be "JAN" branded by the manufacturer only after they have passed Government inspection at the place of manufacture during the manufacturing process. As proof of Government source inspection the inspector imprints his "Eagle" acceptance stamp on the packing lists accompanying each shipment of tubes. In addition the inspector affixes his signature to a written certification that the tubes have been source inspected and passed all the required tests.

4. See § 3.7.1.2 of note 3 *supra.*

5. In 1963 non-obsolete JAN 4X150G tubes had a market price of $40.00 per tube.

session in January 1964[6] the following markings:

(1) The JAN designation;

(2) The manufacturer's qualification code (CIM); and

(3) The acceptance date (6318).

The defendants knew these markings were false and inaccurate. Before shipping the falsely branded tubes to Model defendants sent the tubes to Saxon Laboratories, Inc. in New York for a MIL. E–1 electrical test. After the test was completed and the tubes were found operable, a facsimile of a Government inspector's "Eagle" stamp was affixed to each of the defendants' packing lists accompanying the shipments to Model.[7] This stamping was accomplished at Saxon Laboratories by someone other than defendants Page and Bornstein.

There were twenty-one packing lists covering the tubes and containing their serial numbers.[8] The packing lists comprised three separate shipments to Model. Accompanying each shipment was a "Certificate of Compliance" signed by defendant Page as vice-president of United. The certificate stated as follows:

It is hereby certified that all materials used in the manufacture of parts in the quantity called for on the subject purchase order received by Model . . . conform to the material and/or manufacturing specifications as called for on said purchase order.

Physical, Electrical, and/or Chemical test reports are on file with us or with our suppliers for examination and indicate conformance with applicable specification requirements.

United billed Model on three separate invoices and was paid $32.00 per tube by Model.

The United States received 684 4X150G tubes from Model under the contract. Of this total number of tubes 442 were found to contain:

(1) A false JAN designation;

(2) A false manufacturer's qualification code (CIM); and

(3) A false acceptance date (6318).

These falsely branded tubes were removed from the radio kits purchased from Model. Only 397 of these tubes can be identified by serial number as having been supplied by defendants. Serial numbers for the remaining forty-five improperly branded tubes are unknown and cannot be directly traced to defendants.

Model submitted to the United States thirty-five claims for payment under the contract. These claims were designated as invoices. Each invoice included claims for payment for tubes that had been "JAN" branded by the defendants although defendants did not prepare any of Model's invoices or have knowledge of the manner in which claims were presented to the Government. Model's thirty-five claims were paid with eight Government vouchers. The cost to the United States to replace the falsely branded tubes was $40.82 per tube.[9]

6. United purchased 380 tubes from Arthur H. Richardson, Inc. at a price of $17.50 per tube. Arthur H. Richardson, Inc. was a franchised distributor of Eimac and had purchased 451 tubes, which had been placed in termination inventory due to a design change, for a price of $15.52 per tube.

7. These packing lists did not, however, contain the Government inspector's written certification that the tubes had been source inspected and had passed all the required tests. See note 4 supra.

8. One additional United packing list was found in Model's possession in July 1964, however, this list does not reference the contract number and does not refer to any tubes by serial number.

9. The stipulation submitted to this Court stated as follows:
17.(o) The cost to the United States in replacing the 442 falsely marked 4X150G electron tubes was $40.82 per tube or a total of $18,042.44 which is subject to proof by affidavit or voucher. (Emphasis added)

In May 1966 defendants Bornstein and Page pleaded guilty to Count II of an indictment which charged that from January 24, 1964, through June 3, 1964, they conspired to cause to be submitted to an agency of the United States false statements and representations to material facts and conspired to possess forged documents enabling Model to obtain money from the United States. Defendants were each given a suspended sentence and placed on probation for two years. Neither defendant was fined. In December 1966 Model paid the United States $18,000.00 in settlement of a claim brought against Model for the 442 falsely branded tubes.

The legal issues which confront the Court are as follows: did the defendants violate the False Claims Act; if the Court finds that the Act was violated, what actual damages, if any, were suffered and how are they to be computed; and, how is the number of forfeitures to be computed.

## I

### STATUTORY VIOLATION

The applicable section of the False Claims Act, 31 U.S.C.A. § 231, provides, in pertinent part:

Any person . . . [1] who shall . . . cause to be made . . . or cause to be presented, for payment or approval, to . . . any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department . . . thereof, knowing such claim to be false, fictitious, or fraudulent, [2] or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any . . . voucher . . . claim, certificate, affidavit . . . knowing the same to contain any fraudulent or fictitious statement . . . [3] or who enters into any agreement . . . or conspiracy to defraud . . . the United States, or any department . . . thereof, by obtaining or aiding to obtain the payment . . . of any false or fraudulent claim . . . shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act . . . .

■ Applying the findings of this Court to the above quoted statutory language, it is an inescapable conclusion that defendants Bornstein and Page violated the provisions of section 231 of the Act. Defendants knew the materials they were furnishing Model were for use in a Government contract. They were also aware that their initial shipment of 120 tubes was unacceptable because the tubes lacked the required "JAN" brands. By knowingly affixing or causing to be affixed false markings on the tubes and by certifying that all materials furnished conformed to the applicable specifications, defendants caused Model to present thirty-five claims for payment to the United States. Each claim included a request for payment on behalf of some falsely branded tubes. The defendants, therefore, knew that the portion of Model's claims for payment which encompassed the falsely branded tubes would be fraudulent. This constitutes a clear violation of "clause one" of section 231 of the Act.

Approximately one month after the stipulation was received the United States Attorney submitted documentation, which technically was not an "affidavit or voucher," showing, *inter alia*, that the per tube cost of replacement was $40.82. Counsel for defendants strenuously object to our receipt of this documentation and a subsequent affidavit submitted under cover of June 4, 1973. We accept this documentation for the sole purpose of meeting the Government's required standard of proof on the issue of replacement cost. Extraneous facts contained in these additional Government documents in no way alter the stipulation. Defendants' motion to strike the Government's claim for actual damages, which motion was made at oral argument, is therefore denied.

[2, 3] By submitting to Model vouchers and certificates containing statements defendants knew were fraudulent, Bornstein and Page aided Model in obtaining payment for fraudulent claims. This is a violation of "clause 2" of section 231 of the Act. Finally it has been established by clear and convincing proof that defendants agreed or conspired to aid to obtain the payment of fraudulent claims, thereby violating "clause 3" of section 231 of the Act. The evidence that convinces the Court of the existence of this agreement or conspiracy is as follows: After having been notified that the tubes were unacceptable for lack of "JAN" markings each defendant, on at least one occasion, either certified or stated to Model that materials furnished by United pursuant to Model's purchase order would meet the applicable Government specifications; defendants admitted either affixing or causing to be affixed the false "JAN" markings; and defendants pleaded guilty to Count II of an indictment charging them with conspiracy.

It is immaterial that defendants did not deal directly with the Government. That they were one step removed from direct contact with the Signal Supply Agency does not vitiate or diminish their liability. In United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), the Court stated that the provisions of the Act "indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *Id.* at 544–545, 63 S.Ct. at 384. In that case the Court held the Act applicable to contractors who, by collusive bidding, obtained contracts with municipalities and school districts of a state for work on federal Public Works Administration projects. The contractors were paid for their work with federal funds even though actual payments were made in the names of the local authorities.

The Court of Appeals for the Third Circuit has ruled, on at least two occasions, that the wrongdoer need not be in a direct contractual relationship with the Government in order to be liable for false claims under the Act. In United States v. Rohleder, 157 F.2d 126 (3d Cir. 1946), defendant Rohleder had entered into sixteen subcontracts with the Cramp Shipbuilding Company pursuant to a contract between Cramp and the Navy to complete certain shipyard improvements. The scheme for which Rohleder was found liable under the Act involved collusive bidding on items included in work under the subcontracts. Since the fraud was committed with respect to the subcontracts, Rohleder was held liable for sixteen $2,000 forfeitures. *Id.* at 131. *Accord,* United States v. Veneziale, 268 F.2d 504, 505 (3d Cir. 1959); *see* United States v. Ueber, 299 F.2d 310 (6th Cir.), aff'd following remand for further findings of fact, 303 F.2d 462 (6th Cir. 1962); Murray & Sorenson, Inc. v. United States, 207 F.2d 119 (1st Cir. 1953).

## II

### ACTUAL DAMAGES SUFFERED

Although the Government removed 442 falsely branded 4X150G tubes from the radio kit sets supplied by Model, the proofs show that only 397 of these tubes can be traced by serial number as having originated with defendants. Notwithstanding the similarity between the markings on these 397 tubes and those on the remaining forty-five tubes not identified by serial number, this Court is not persuaded that defendants are liable for these latter tubes. This is particularly so in light of the fact that a total of 684 4X150G tubes were received from Model and there has been no showing that United was the sole supplier of 4X150G tubes.

The Government has established that the per unit cost to replace the tubes was $40.82. Since defendants were liable for only 397 falsely branded tubes,

the total amount of actual damages attributable to them is $16,205.54. Whether the falsely branded tubes have absolutely no value to the Government and therefore warrant no application of credit to defendants on their behalf is an issue over which the litigants are diametrically opposed. The parties do agree, however, that the rule of law to be applied in determining the amount of actual damages was stated in United States v. Ben Grunstein & Sons, Co., 137 F.Supp. 197 (D.N.J.1955).

■ The essence of the fraudulent scheme in that case involved circumvention of the meat inspection system of the United States Army. Defendants in *Ben Grunstein* were charged with knowingly supplying substandard meats to the Army. After disposing of a discovery matter, the court entered a supplemental opinion dealing with the measure of damages to be applied in that case. The court cited *Marcus* as specifically rejecting the application of the so-called "out-of-pocket" rule of damages in a False Claims Act proceeding. In fact, the court in *Ben Grunstein* felt that the Supreme Court in *Marcus* had applied what is called the "benefit-of-the-bargain" rule of damages. The court in *Ben Grunstein* stated as follows:

> [The "benefit-of-the-bargain" rule,] in a case where the fraud is as to the goods received by the person defrauded . . . is the difference between the value of what plaintiff would have received, but for the fraud, and the value of what he did receive in fact, due to the fraud. This might be more simply stated as being the value of the property which the person defrauded would have received but for the fraud, less, as a credit, the value of the property which he has in fact received. United States v. Ben Grunstein & Sons, Co., *supra* at 205.

The court adopted the "benefit-of-the-bargain" rule holding that the just measure of actual damages plaintiff had

sustained was the value of the meat defendant was under contract to deliver less the value of the meat in fact delivered. *Id.* at 210.

In the case *sub judice* the value of the goods the Government should have received but for defendants' fraud is analogous to the per tube cost of replacing the tubes supplied by defendants. As previously stated that sum is $16,205.54. The Government contends that since no permission to supply other than "JAN" branded tubes was given to Model the entire lot of falsely branded tubes had absolutely no value. Therefore no credit should be applied to lessen the amount of actual damages suffered. Defendants, of course, take issue with this contention.

Defendants argue that although the tubes did not meet the required specifications they did have value, at least to the defendants, and were never returned by the Government. At the very minimum, defendants continue, they should be given credit for the per unit price of $15.52 paid by Arthur H. Richardson, Inc.[10] It could also be argued that the value of the tubes actually furnished should be computed by utilizing either the per unit price of $17.50 paid by United or the per unit price of $32.00 paid by Model. The issue need not be decided on this basis, however, because the $18,000.00 settlement paid by Model must be considered, and when this is done the actual value of the falsely branded tubes, for purposes of determining actual damages, becomes moot.

The Government advances two arguments concerning application of the $18,000.00 settlement as a credit on behalf of defendants. First, the Government argues that no portion of Model's settlement can be used as a credit applied against the actual damages caused by Bornstein and Page. Secondly, if the Court decides that defendants are entitled to credit, then it may be applied only after doubling the actual damages

10. See Note 7 *supra.*

of $18,042.44. This Court rejects both these arguments for the reasons below.

■ With respect to the denial of credit altogether, the Government's argument is basically that the $18,000.00 settlement came from a source collateral to defendants and, therefore, should not inure to their benefit. The Government supports this argument by directing the Court's attention to the "collateral source rule" and to United States v. Klein, 230 F.Supp. 426 (W.D.Pa.1964), *aff'd*, 356 F.2d 983 (3d Cir. 1966).

The "collateral source rule" is a tort concept which allows a plaintiff to recover full damages from a defendant who is liable for the injury, notwithstanding the fact that plaintiff has already been paid his salary or pension during disability, or had his medical expenses paid by another, or out of the proceeds of an accident insurance policy. In this case plaintiff may receive double payment for the same items. The defendant wrongdoer, however, does not get the benefit of payments that plaintiff receives from a collateral source. 3 F. Harper & F. James, The Law of Torts, § 25.22, at 1343–44 (1956). The key to the application of this rule, which denies credit to the wrongdoer, is a determination that the source of the benefit to plaintiff is truly collateral to the wrongdoer. In the case *sub judice* Model and United were contracting parties, and it is clear that in any action brought against Model on the main Government contract, United could have been joined as a third party if the goods it furnished were alleged to have been the cause of the breach of the main contract. That Model chose not to pursue United when the Government brought its claim against Model does not adversely affect this Court's finding that Model's actions in settling the claim were at least partially motivated by the actions of defendants. In this respect at least the settlement was not truly collateral and will not operate to bar application of a credit on defendants' behalf.

United States v. Klein, *supra*, is not apposite. In that case defendants had procured fraudulent mortgage loan applications to induce the Veterans Administration to issue loan guarantees to veterans who were supposedly living in the houses. After the loans went into default, foreclosure proceedings were instituted. The court refused to credit to defendant Klein a $60,000.00 payment that the Government had collected on account of its claim against First Federal Savings & Loan Association of Greene County. First Federal had participated in the scheme to procure Veterans Administration approval for the loans. The court refused to apply the credit, not solely because Klein was a non-contributing defendant, but because the evidence was incompetent to show who paid the $60,000.00 or for what reason it was paid. The court stated as follows:

> We know that a number of others were involved in the Bretz deals as participants. We don't know what the involvements were. We don't know what claims, if any, there were and against whom. No evidence was introduced that First Federal paid any money, nor is there any evidence of why the $60,000.00 was paid. To make a deduction here that it was basically and totally on account of the Klein claim is pure speculation. 230 F.Supp. at 443.

This Court cannot say that the result would have been the same if defendant had carried his evidential burden.

■ *Klein* is also of assistance in rejecting the Government's contention that if we are to apply a credit then it should be applied only after doubling the figure of $18,042.44. This very issue was raised by the defendant in *Klein*. The court stated as follows:

> Certain credit amounts were received by the plaintiff after foreclosures of the properties. The Government urges that damages should be first doubled and that allowable credits should be deducted from the double damages. The defendant disagrees. The Act provides that in addition to the $2,000 forfeiture, the plaintiff is to be allowed double the amount of damages which it may have sustained. The Act does not indicate when dam-

878

ages are to be doubled, it merely provides for double the amount of damages, and this reasonably appears to be such as are finally determined.

Accordingly, *the credit should be first deducted from the single damages as finally determined and the remainder doubled* for the purpose of determining the amount of damages to which the plaintiff was entitled. [Emphasis Added]. *Id.*

Having determined that the $18,000.00 settlement should inure to defendants' benefit and be deducted from the single damages, the Court must now consider the computation of actual damages. Since Model paid $18,000.00 for 442 falsely branded tubes, the per tube value of that settlement was $40.72. The value of the 397 tubes attributable to defendants was $16,165.84, and the value of what the Government should have received on behalf of defendants was $16,205.54. Single damages, therefore, are $39.70, doubled $79.40.

### III

### FORFEITURES

The Government contends that thirty-eight $2,000 forfeitures should be assessed for violations of the Act committed and caused to be committed by the fraudulent acts of defendants. Those forfeitures are as follows: One forfeiture for defendants' twenty-one false "Certificates of Compliance" issued to Model; one forfeiture for causing a facsimile of a Government source inspector's "Eagle" acceptance stamp to be imprinted upon each of defendants' twenty-one packing lists; one forfeiture for acquiring surplus 4X150G tubes and "JAN" branding them; thirty-five forfeitures for causing Model to present to the United States thirty-five separate fraudulent claims for payment. Defendants, on the other hand, argue that the maximum number of forfeitures that possibly can be imposed are three, one for each of the three shipments to Model, and that this Court should impose only one forfeiture for the one contract between United and Model.

The Court rejects outright the Government's claim for the three individual forfeitures. First, there has been no evidence establishing that defendants issued *twenty-one* false "Certificates of Compliance" to Model. Secondly, there has been no evidence that defendants caused the "Eagle" acceptance stamp to be imprinted on their packing lists. Thirdly, since the Act proscribes the submission of fraudulent claims for payment to the United States, the Court does not reach the question whether falsely branding the tubes in and of itself constitutes a violation of the Act. Accordingly, the litigants' remaining contentions must be considered.

■ Courts have consistently applied the Act's forfeiture section to impose various numbers of forfeitures for individualized acts occurring within a single continuing course of conduct. *E.g.* United States ex rel. Marcus v. Hess, *supra*; United States v. Ueber, *supra*; United States v. Rohleder, *supra*. It is also clear, as the Court has previously noted, that a person may be held liable under the Act even though the fraudulent claims presented to the United States were not submitted by him. Typically the false claim is submitted by a main contractor who has been caused to submit a false claim through the fraudulent acts of a subcontractor. *E.g.*, United States ex rel. Marcus v. Hess, *supra*; Murray & Sorenson, Inc. v. United States, *supra*, at 123. There is no difficulty, therefore, in assessing the statutory forfeitures against defendants Bornstein and Page. The only problem is determining the correct number of forfeitures to be imposed.

In this respect United States v. Ueber, *supra*, is particularly instructive. In that case defendant Ueber was a subcontractor to two separate corporations which had prime contracts with the Government. Each of Ueber's subcontracts provided fixed hourly rates for "direct labor" furnished pursuant to the subcontracts. Furthermore, the payments for "direct labor" were to be in lieu of all other charges, including overhead. The complaint charged that during a six

month period Ueber had charged as direct labor the time of three of its employees which actually was overhead or "indirect labor." Ueber had presented a total of 422 invoices to the prime contractors containing such charges. In turn the two prime contractors had presented a total of fifty-four vouchers to the United States. Each of these vouchers represented a claim for payment based on at least some of the 422 invoices submitted by Ueber. The district judge assessed a $2,000 forfeiture for each of the fifty-four vouchers submitted through the two prime contractors for a total of $108,000.00 in forfeitures. 299 F.2d at 312.

■ On appeal Ueber contended that the assessment of fifty-four forfeitures based on the vouchers submitted by the prime contractors was error. He argued that only two forfeitures should have been assessed, one for each subcontract. The Court of Appeals for the Sixth Circuit rejected Ueber's argument stating:

The conduct proscribed by § 231, as applicable here, consisted of acts of causing false claims to be presented to the government. Each voucher which Ueber caused to be submitted through [the prime contractors] was a separate act justifying an assessment of a separate forfeiture. . . . Plaintiff's complaint did not charge that the entering into subcontract . . . in any way violated § 231. These contracts were valid. The vouchers submitted to the United States to obtain payments under such contracts made up the acts which offended the False Claims Act. [Citations Omitted]. Id. at 313.

As in Ueber, there is no charge that fraudulent conduct procured the contract between Model and United or that the contract itself violated section 231. The fraudulent acts in the present case occurred after the contract had been negotiated. Those acts caused Model to submit thirty-five false claims, each of which constituted a separate violation justifying a separate forfeiture.

United States ex rel. Marcus v. Hess and United States v. Rohleder do not compel a different result and do not support defendants' alternative contentions that a minimum of one forfeiture, for the one contract between Model and United, and a maximum of three forfeitures, one for each shipment from United to Model, should be imposed. Both Hess and Rohleder involved collusive bidding schemes regarding public works projects and subcontracts respectively. Forfeitures were based on the number of projects in Hess and on the number of subcontracts in Rohleder. In those cases the incidence of the fraud was localized, in Hess on each of the projects, and in Rohleder on each of the subcontracts. In this case the incidence of the fraud was localized in the claims submitted by Model to the United States.

Accordingly counsel for the United States shall submit an order consistent with this opinion giving judgment for the United States in the amount of $70,079.40.