UNITED STATES *v.* BORNSTEIN ET AL.

No. 74–712.  Argued October 8, 1975—Decided January 14, 1976

STEWART, J., delivered the opinion of the Court, in which BREN-
NAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined, and in Parts
I and III of which BURGER, C. J., and WHITE and REHNQUIST, JJ.,
joined. REHNQUIST, J., filed an opinion concurring in part and
dissenting in part, in which BURGER, C. J., and WHITE, J., joined,

*post*, p. 317. STEVENS, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Jones* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Acting Assistant Attorney General Jaffe,* and *David M. Cohen.*

*Jack Ballan* argued the cause and filed a brief for respondent Bornstein. *William Rossmoore* argued the cause and filed a brief for respondent Page.

MR. JUSTICE STEWART delivered the opinion of the Court.

The False Claims Act provides that the United States may recover from a person who presents a false claim or causes a false claim to be presented to it a forfeiture of $2,000 plus an amount equal to double the amount of damages that it sustains by reason of the false claim.[1] This case presents two interpretative problems

---

[1] The False Claims Act was adopted in 1863. Act of Mar. 2, 1863, c. 67, 12 Stat. 696. It was re-enacted as Rev. Stat. §§ 3490–3494, 5438. The part of the Act dealing with civil prohibitions is now codified in 31 U. S. C. § 231 *et seq.* The language used in Title 31 differs in some important respects from that contained in the Revised Statutes. Since Title 31 has not been enacted into positive law, the official text of the statute is that which appears in the Revised Statutes. See *United States* v. *Neifert-White Co.,* 390 U. S. 228, 228–229, n. 1; *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537, 539–540, and n. 2.

The relevant statutory provisions are as follows:

§ 3490. "Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall do or commit any of the acts prohibited by any of the provisions of section fifty-four hundred and thirty-eight, Title 'CRIMES,' shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together

that arise when the United States sues a subcontractor under the Act on the ground that the subcontractor has caused the prime contractor to present false claims: First,

with the costs of suit; and such forfeiture and damages shall be sued for in the same suit."

§ 5438. "Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, or who, having charge, possession, custody, or control of any money or other public property used or to be used in the military or naval service, who, with intent to defraud the United States or willfully to conceal such money or other property, delivers or causes to be delivered, to any other person having authority to receive the same, any amount of such money or other property less than that for which he received a certificate or took a receipt, and every person authorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammunition, provisions, clothing, or other property so used or to be used, who makes or delivers the same to any other person without a full knowledge of the truth of the facts stated therein, and with intent to defraud the United States, and every person who knowingly purchases or receives in pledge for any obligation or indebtedness from any soldier, officer, sailor, or other person called into or employed in the military or naval service any arms, equipments, ammunition, clothes, military stores, or other public property, such soldier, sailor, officer, or other person not having the lawful right to pledge or sell the same, every person so offending in any of the matters set forth in this section shall be imprisoned at hard labor for not less than one nor more

how should the number of $2,000 forfeitures be counted? Second, when the United States has already recovered damages from the prime contractor because of the subcontractor's fraud, what effect does that recovery have upon the Government's right to recover double damages from the subcontractor?

## I

In 1962, the United States entered into a $2,100,000 contract with Model Engineering & Manufacturing Corporation, Inc. (Model), for the provision of radio kits. Each kit was to contain electron tubes that met certain specifications. Model subcontracted with United National Labs (United) to supply these tubes at a price of $32 each. The tubes that United sent to Model under this subcontract were not of the required quality, but were falsely marked by United to indicate that they were. United sent at least 21 boxes of these falsely marked tubes to Model, in three separately invoiced shipments. The radio kits that Model in turn shipped to the United States contained 397 of those falsely marked tubes. Model sent 35 invoices to the Government for the radio kits, and each invoice included claims for payment for the falsely marked tubes that had been supplied to Model by United. After the Government discovered the fraud, it recovered $40.72 per tube from Model and also retained the falsely marked tubes.

---

than five years, or fined not less than one thousand nor more than five thousand dollars."

Section 5438 was repealed in 1909. Act of Mar. 4, 1909, c. 321, § 341, 35 Stat. 1153. It has continued vitality only insofar as it specifies the acts giving rise to civil liability under § 3490. See *United States* v. *Neifert-White Co., supra.* The criminal prohibitions were subsequently altered and codified in 18 U. S. C. §§ 287 and 1001.

308

Subsequently, the Government brought this civil action in a Federal District Court under the False Claims Act against United and two of its owner-officers, the respondents Philip L. Bornstein and Gerald Page.[2] The complaint alleged that United was liable for 35 $2,000 forfeitures—one forfeiture for each invoice that it had "caused" Model to submit,[3] and also claimed damages of $16,205.54, consisting of $40.82 per tube for 397 tubes. The trial court agreed that there had been 35 forfeitures, but ruled that before the Government's damages could be doubled, they were to be reduced by the amount of Model's payment to the United States. The court accordingly computed double damages at only $79.40 and awarded the Government a total of $70,079.40. 361 F. Supp. 869 (NJ). On cross-appeals the Court of Appeals agreed with the trial court on the double-damages issue, but concluded that since there had been only one subcontract involved, there should be only one statutory forfeiture. Accordingly, the appellate court held that United was liable for only $2,079.40. 504 F. 2d 368 (CA3). We granted the Government's petition for certiorari to consider the statutory questions presented. 420 U. S. 906.

II

*The Number of Statutory Forfeitures*

The False Claims Act provides that a person "who

---

[2] United was dismissed as a party prior to judgment. For convenience, however, the respondents are sometimes referred to in this opinion as United. The United States also brought criminal charges against Bornstein and Page. They pleaded guilty to those charges and were given suspended sentences.

[3] The Government also claimed that United was liable for three additional $2,000 forfeitures under the second clause of § 5438 which prohibits the preparation and use of false documents in support of a false claim. See n. 1, *supra.* The Government does not press that claim here.

shall do or commit any of the acts prohibited by" Rev. Stat. § 5438 "shall forfeit and pay to the United States the sum of two thousand dollars . . . ." Rev. Stat. § 3490. Section 5438 makes it illegal for a person to present or cause to be presented "for payment or approval . . . any claim upon or against the Government of the United States . . . knowing such claim to be false, fictitious, or fraudulent." It is settled that the Act permits recovery of multiple forfeitures and that it gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim to the Government. See *United States ex rel. Marcus* v. *Hess*, 317 U. S. 537. The precise issue presented here is whether the subcontractor should be liable for each claim submitted by its prime contractor or whether it should be liable only for certain identifiable acts that it itself committed.[4]

The legislative history of the Act offers little guidance on how properly to determine the number of forfeitures. The Act was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War.[5] There is no indication that Con-

---

[4] In cases involving prime contractors the number of imposable forfeitures has generally been set at the number of individual false payment demands that the contractor has made upon the Government. See, *e. g., United States* v. *Woodbury*, 359 F. 2d 370, 377–378 (CA9); *Fleming* v. *United States*, 336 F. 2d 475, 480 (CA10); *United States* v. *National Wholesalers*, 236 F. 2d 944, 950 (CA9); *Faulk* v. *United States*, 198 F. 2d 169, 171 (CA5); *United States* v. *Grannis*, 172 F. 2d 507, 515–516 (CA4); *United States* v. *Collyer Insulated Wire Co.*, 94 F. Supp. 493, 496–498 (RI). Cf. *United States* v. *Ueber*, 299 F. 2d 310 (CA6). This result is in accord with this Court's statement that " 'the conception of a claim against the government normally connotes a demand for money or for some transfer of public property.' " *United States* v. *McNinch*, 356 U. S. 595, 599, quoting *United States* v. *Tieger*, 234 F. 2d 589, 591 (CA3).

[5] According to its sponsor, the False Claims Act was adopted

gress gave any thought to the question of how the number of forfeitures should be determined in cases involving subcontractor fraud. But the absence of specific legislative history in no way modifies the conventional judicial duty to give faithful meaning to the language Congress adopted in the light of the evident legislative purpose in enacting the law in question.

The respondents defend the decision of the Court of Appeals that held them liable for only one forfeiture. In reaching this conclusion the Court of Appeals relied principally on its earlier decision in *United States* v. *Rohleder,* 157 F. 2d 126 (CA3), where it found that 16 forfeitures were appropriate because 16 contracts were involved. The *Rohleder* court had relied in turn on this Court's decision in *United States ex rel. Marcus* v. *Hess, supra.* The *Hess* case involved several electrical contractors who had collusively bid on 56 Public Works Administration projects. The District Court in *Hess* had imposed 56 forfeitures, rejecting the defendants' claim that only one forfeiture should have been imposed because there had been only one fraudulent scheme. This Court concluded that the District Court was correct because the incidence of fraud on each separate project was clearly individualized. 317 U. S., at 552. No party argued in this Court that more than 56 forfeitures should have been imposed, and no statement in the *Hess* opinion expressly limited the number of imposable forfeitures to the number of contracts involved in a case. *Hess* simply approved the result reached by the District Court which had found that "in each project there was a single, false, or fraudulent claim." 41 F. Supp. 197, 216 (WD Pa.).

---

"for the purpose of punishing and preventing . . . frauds." Cong. Globe, 37th Cong., 3d Sess., 952 (remarks of Sen. Howard). See also *id.,* at 955 (remarks of Sen. Wilson).

The *Hess* case, therefore, in no way stands for the proposition that the number of forfeitures is inevitably measured by the number of contracts involved in a case. Such an automatic measurement would ignore the plain language of the statute, as the present case itself illustrates. United is liable under the statute only because it engaged in conduct that caused false claims to be submitted to the United States. While it is true that no false claims would have been submitted had United and Model not entered into a contractual relationship, the entry into that relationship did not in itself cause the submission of any false claims. Had United shipped tubes of the required quality to Model, no false claims would have been presented. By the same token, Model was not caused to file a false claim until it received shipments of falsely branded tubes from United. The language of the statute focuses on false claims, not on contracts. See n. 4, *supra*. That language does not support a conclusion that United is chargeable with only one forfeiture in this case.

To equate the number of forfeitures with the number of contracts would in a case such as this result almost always in but a single forfeiture, no matter how many fraudulent acts the subcontractor might have committed. This result would not only be at odds with the statutory language; it would also defeat the statutory purpose.[6] Such a limitation would, in the language of the Government's brief, convert "the Act's forfeiture provision into little more than a $2,000 license for subcontractor fraud."

At the other extreme, the Government urges that 35 forfeitures should be assessed, in accord with the position of the District Court, which ruled that "[United's fraudulent] acts caused Model to submit thirty-five false

---

[6] See n. 5, *supra*.

claims, each of which constituted a separate violation justifying a separate forfeiture." 361 F. Supp., at 879. The difficulty with this position is that it fails to distinguish between the acts committed by Model and the acts committed by United.[7] The distinction is a critical one, because the statute imposes liability only for the commission of acts which cause false claims to be presented.

If United had committed one act which caused Model to file a false claim, it would clearly be liable for a single forfeiture. If, as a result of the same act by United, Model had filed three false claims, United would still have committed only one act that caused the filing of false claims, and thus, under the language of the statute, would again be liable for only one forfeiture. If, on the other hand, United had committed three separate such causative acts, United would be liable for three forfeitures, even if Model had filed only one false claim. The Act, in short, penalizes a person for his own acts, not for the acts of someone else.

The Government's claim that United "caused" Model to submit 35 false claims is simply not accurate. While United committed certain acts which caused Model to submit false claims, it did not cause Model to submit any particular number of false claims. The fact that Model chose to submit 35 false claims instead of some other number was, so far as United was concerned, wholly irrelevant—completely fortuitous and beyond United's knowledge or control. The Government suggests that United assumed the risk that Model might send 35 invoices when United sent the falsely branded tubes to Model. The statute, however, does not penalize United for what Model did. It penalizes United for what *it* did. The construction given to the statutory

---

[7] Cf. *United States* v. *Ueber*, 299 F. 2d 310 (CA6).

language by the District Court is, therefore, no more satisfactory than the interpretation adopted by the Court of Appeals.

A correct application of the statutory language requires, rather, that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures. In the present case United committed three acts which caused Model to submit false claims to the Government—the three separately invoiced shipments to Model. If United had not shipped any falsely branded tubes to Model, Model could not have incorporated such tubes into its radio kits and would not have had occasion to submit any false claims to the United States. When, however, United dispatched each shipment of falsely marked tubes to Model, it did so knowing that Model would incorporate the tubes into the radio kits it later shipped to the Government, and that it would ask for payment from the Government on account of those tubes. Thus, United's three shipments of falsely branded tubes to Model caused Model to submit false claims to the United States, and United is thus liable for three $2,000 statutory forfeitures representing the three separate shipments that it made to Model.[8]

## III

### Computation of Double Damages

In the District Court "[t]he Government . . . established that the per unit cost to replace the [falsely

---

[8] This Court has noted that in construing § 5438 "we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible [of] numerous definitions." *United States* v. *McNinch*, 356 U. S., at 598. See also *Rainwater* v. *United States*, 356 U. S. 590, 592–593.

branded] tubes was $40.82." 361 F. Supp., at 875. Finding that the Government had already received $40.72 per tube as damages from Model, the court concluded, and the Court of Appeals agreed, that the Government's total statutory damages were $79.40—double the 10-cent difference per tube between its replacement costs and the payment already received from Model for the 397 tubes.

The Government argues that both courts were wrong, and that its damages under the Act should be calculated by doubling the amount of its original loss and only then deducting Model's payment from that doubled amount.[9] We agree that the Government's damages should be doubled before any compensatory payments are deducted, because that method of computation most faithfully conforms to the language and purpose of the Act.[10]

Although there is nothing in the legislative history that specifically bears on the question of how to calculate double damages, past decisions of this Court have reflected a clear understanding that Congress intended the double-damages provision to play an important role in compensating the United States in cases where it has been defrauded. "We think the chief purpose of the [Act's civil penalties] was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole." *United States ex rel. Marcus* v. *Hess,* 317 U. S., at 551–552. For

[9] At one point in this litigation the Government urged that any compensatory payments it received should not be deducted from its statutory damages at all. It has now abandoned that position, perhaps for the reason that since United is liable to Model for Model's payment to the United States, United would in effect be assessed triple damages under such a rule.

[10] The statute speaks of doubling "damages" and not doubling "net damages" or "uncompensated damages."

several different reasons, this make-whole purpose of the Act is best served by doubling the Government's damages before any compensatory payments are deducted.

First, this method of computation comports with the congressional judgment that double damages are necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims.[11] Second, the rule that damages should be doubled prior to any deductions fixes the liability of the defrauder without reference to the adventitious actions of other persons. The position adopted by the Court of Appeals would mean that two subcontractors who com-

---

[11] As originally enacted, the False Claims Act contained a *qui tam* provision which authorized any person to bring an action on behalf of the United States to recover the civil penalties that could be imposed under the Act. Act of Mar. 2, 1863, § 4, 12 Stat. 698. If successful, the person would receive one-half of the damages awarded to the United States. § 6. Respondents suggest that double damages were provided by Congress because it knew that half of the Government's recovery would go to a private person and that as a result double damages were necessary in order to allow the Government's share of the proceeds of a suit to cover the Government's single damages. Thus, they argue that Congress never concluded that the United States needed to recover double damages in order to be made completely whole.

This argument would have some force if the only enforcement mechanism provided in the Act were the *qui tam* action. However, the Act clearly envisioned that the Government could sue on its own behalf, § 4, and it specifically exhorted United States attorneys to enforce the Act diligently. § 5. Moreover, in 1943 Congress placed restrictions on the possibility of bringing a *qui tam* action and limited a private person's recovery to a maximum of one quarter of the damages awarded the United States, Act of Dec. 23, 1943, c. 377, 57 Stat. 608. In adopting these changes, Congress did not make any adjustment in the double-damages provision, again suggesting that it thought that double damages are necessary to make the United States whole in fraudulent-claim cases.

mitted similar acts and caused similar damage could be subjected to widely disparate penalties depending upon whether and to what extent their prime contractors had paid the Government in settlement of the Government's claims against them. Just as fortuitous acts of the prime contractor should not determine the liability of the subcontractor under the forfeiture provision of the Act, so likewise the prime contractor's fortuitous acts should not determine the liability of the subcontractor under the double-damages provision. Third, the reasoning of the Court of Appeals and the District Court would enable the subcontractor to avoid the Act's double-damages provision by tendering the amount of the undoubled damages at any time prior to judgment. This possibility would make the double-damages provision meaningless. Doubling the Government's actual damages before any deduction is made for payments previously received from any source in mitigation of those damages forecloses such a result.[12]

For these reasons we hold that, in computing the double damages authorized by the Act, the Government's actual damages are to be doubled before any subtractions are made for compensatory payments previously received by the Government from any source.[13] This method of

---

[12] The only two District Courts that have addressed this question have reached opposing results. Compare *United States* v. *Klein*, 230 F. Supp. 426, 443 (WD Pa.), aff'd *per curiam*, 356 F. 2d 983 (CA3) (damages doubled after offsetting credits deducted), with *United States* v. *Globe Remodeling Co.*, 196 F. Supp. 652, 657 (Vt.) (damages doubled before offsetting credits deducted).

[13] The Government's actual damages are equal to the difference between the market value of the tubes it received and retained and the market value that the tubes would have had if they had been of the specified quality. C. McCormick, Law of Damages § 42, p. 137 (1935). See, *e. g., United States* v. *Cooperative Grain & Supply Co.*, 476 F. 2d 47, 61–65 (CA8); *United States* v. *Foster Wheeler Corp.*,

computation, which maximizes the deterrent impact of the double-damages provision and fixes the relative rights and liabilities of the respective parties with maximum precision, best comports in our view with the language and purpose of the Act.

The judgment is reversed, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE WHITE join, concurring in part and dissenting in part.

I join the opinion of the Court with respect to Part III's treatment of the double-damages issue. But the narrow construction of the False Claims Act adopted by the Court in Part II of the opinion, while not repugnant to the face of the statute itself, is by no means the only permissible construction of that language. Because that construction, as applied to the facts of this case, leads to an arbitrary result providing a windfall for those who would seek to defraud the Government, I would construe the statute somewhat differently than does the Court. Instead of concentrating in isolation on the "conduct of the person from whom the Government seeks to collect the statutory

447 F. 2d 100, 102 (CA2); *United States* v. *Woodbury,* 359 F. 2d, at 379; *Toepleman* v. *United States,* 263 F. 2d 697, 700 (CA4); *United States* v. *Ben Grunstein & Sons Co.,* 137 F. Supp. 197, 205 (NJ); *United States* v. *American Packing Corp.,* 125 F. Supp. 788, 791 (NJ); but cf. *United States* v. *Aerodex, Inc.,* 469 F. 2d 1003, 1010–1011 (CA5); *Faulk* v. *United States,* 198 F. 2d 169, 172 (CA5).

forfeitures," as the Court does, I believe that the statute requires inquiry as to the relationship, in terms of proximate cause and foreseeability, between the conduct of such person and the number of false claims actually presented to the Government.

Revised Stat. § 3490 provides that any nonmilitary person "who shall do or commit any of the acts prohibited by any" of the provisions of Rev. Stat. § 5438 "shall forfeit and pay" $2,000 to the United States. The "act" which is prohibited by the first clause of § 5438, at issue here, is the "mak[ing] or caus[ing] to be made, or present[ing] or caus[ing] to be presented, for payment . . . any claim . . . against the Government . . . knowing such claim to be false, fictitious, or fraudulent . . . ." That which is proscribed, then, is the causing to be presented a false claim against the Government with knowledge of the falsity of the claim.

Reading the pertinent portion of the above to impose liability only for the "commission of acts *which* cause false claims to be presented" (emphasis added), the Court construes this language to require the trier of fact to "focus in each case . . . upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." It then goes on to hold, apparently as a matter of law, that "the three separately invoiced shipments to Model" were the causative "acts" to which forfeiture liability attaches. As may be more readily seen from an examination of the facts of this case, this extremely narrow construction and application produce a result which bears little relationship to the congressional purpose.

The stipulated facts reveal a complex and altogether deliberate scheme to palm off cheaper, surplus tubes to the prime contractor, Model. Model had contracted to build radio kits for use by the Army. The specifications

for the component parts reflected the Army's understandable desire that military equipment be long lasting and reliable. The radios were to contain new 4X150G electron tubes bearing markings that, pursuant to the underlying military procurement specifications, showed they were manufactured in a plant whose quality-control standards measured up to certain Government requirements *and* were "source" inspected and approved by a Government inspector at the plant during manufacturing.[1] As far as the military was concerned (as opposed to commercial buyers), Eimac was the only authorized manufacturer. Tubes made by Eimac at its designated plant, accompanied by the proper "source" inspection and stamped accordingly, were the only ones qualified to receive genuine affixations. These stringent requirements were reflected in Eimac's market price of $40 per tube.

Respondents, however, with full awareness of what was required under Model's contract, got themselves caught between that market price and their own promise to deliver some 1,000 tubes at $32 each. Model had al-

---

[1] One such required marking is the "JAN" prefix, which stands for Joint Army Navy qualification standard. This brand, registered by the Patent Office, is to be used by the manufacturer only after the tubes have passed Government inspection at the place of manufacture during the manufacturing process. 361 F. Supp. 869, 872 n. 3 (NJ 1973). In addition, following the JAN prefix is the Manufacturer's Qualification Code, which shall be used only by the manufacturer to whom it has been assigned and only as a part of the designation on tubes manufactured at the plant to which qualification approval was granted. *Id.*, at 871 n. 2. Only manufacturers whose plants have passed rigorous qualifying tests are issued this Code. The Code for the sole authorized maker of these tubes was "CIM," which identified Eitel McCullough, Inc. (Eimac), a California corporation. In addition to the JAN–CIM brand on tubes that passed all of the tests, Eimac would imprint a four-figure number indicating the year and week of acceptance. *Id.*, at 872.

ready rejected United's first shipment of 120 *surplus* tubes; with none of them bearing the requisite markings, nonconformity was obvious. The only way respondents were going to profit under their contract with Model was to ship electron tubes that had the appearance of being new and genuine JAN-type [2] electron tubes, bearing markings as if they had been produced by Eimac under the strictures of the Government inspection process. To that end, they bought several hundred surplus tubes, at $17.50 each, from a distributor of Eimac and affixed, on each one, the JAN stamp, a "Manufacturer's Qualification Code" [3] (Eimac's) and an "acceptance" date, all of which markings were palpably false and designed to deceive Model. To complete the illusion, respondents sent the falsely stamped tubes to a testing laboratory where, after inspection, 21 packing lists (referencing the serial numbers) were prepared, each stamped, falsely, with a facsimile of a Government inspector's "Eagle" stamp.[4] The 21 boxes were then combined in three separate .shipments, respondents certifying with each shipment that the tubes conformed to the contract. Duped into accepting the tubes as genuine, Model paid each of the three invoices and incorporated the fraudulent tubes into the radio kits. Model was paid, of course, on 35 separate invoices.

Applying its construction of the statutory language to this multifaceted shell game, the Court concludes that the only "acts" which "caused" the submission of false claims were the three separately invoiced shipments,

[2] See n. 1, *supra*.

[3] See *ibid*.

[4] As proof that the JAN stamp in fact represents the required Government "source" inspection, the Government inspector imprints his "Eagle" acceptance stamp on packing lists accompanying each shipment of tubes. 504 F. 2d 368, 369 (CA3 1974).

reasoning that but for the shipment of "falsely branded" tubes the radio kits, and in turn Model's claims to the Government, would have been genuine. However, the three invoiced shipments were among a host of fraudulent acts, with respect to each of which it could be said that "but for" that act Model's claims to the Government would have been genuine. Had respondents not falsely marked each of the 300-odd tubes which were actually shipped to Model, or had the 21 packing lists covering them not been falsely stamped, it could equally well be said that Model would have submitted no false claims to the Government respecting the tubes supplied by respondents.[5] Thus, on the basis of "but for" causation, which is all the Court's justification really amounts to, there is no support whatever for picking the number 3 in preference to the number 21, or for picking either of those numbers in preference to the total number of tubes each of which was falsely marked. The only way these various "acts" can be distinguished from one another, so far as causation is concerned, is their proximity in time to the submission of the false claims by Model.

The Court's construction of the statute, as applied to these facts, leads to a result which is not only arbitrary but has the effect of allowing those who would defraud the Government to minimize their potential penalties by shipping all of their rotten eggs in one basket. I believe that a somewhat different construction is at least equally consistent with the language and would produce a result far more consistent with the congressional purpose to penalize those who would defraud the Government.

---

[5] Indeed, the facts show that without the false stamping and the false packing lists, no claims *at all* would have been presented by Model, because Model, as it did with respect to the first 120–tube shipment, would have continued to reject tubes whose nonstamping clearly showed them to be nonconforming.

The "act" proscribed is causing a false claim to be presented to the Government with knowledge of its falsity. The Court simply counts the number of causative acts irrespective of the number of false claims actually submitted because the latter number is, in the words of the Court, "wholly fortuitous." But the foregoing examination has shown that the Court's preference for focusing on the "acts" of the subcontractor in isolation leads to an equally fortuitous result. I think that Congress intended the trier of fact in cases such as this to consider not only the "act" of the subcontractor, but also the number of false claims which the act or various acts of the subcontractor caused to be submitted. The first clause of § 5438 by its very terms focuses on protecting the Government not simply from fraud "in the air" but from the presentation for payment of fraudulent *claims*. The Court notes with approval cases involving prime contractors where the number of imposable forfeitures has turned on the number of false-payment demands made upon the Government. *Ante,* at 309 n. 4. If a prime contractor utilized an innocent agent to present a single false claim to a Government agency, but in fact the agent proceeded to split that claim up into multiple invoices, it would mock the statute to suggest that the prime contractor could avoid multiple forfeitures by claiming that he was unable to foresee his agent's conduct. The Court's construction does indeed suggest that in that case the prime contractor could cry "fortuity."

There is nothing on the face of the statute, however, to indicate congressional intent to treat deceitful prime contractors and subcontractors according to the mechanics of the underlying fraud. Instead, the verbal linkage of "acts," "causes," and "false claim" is couched in general terms pointing to a uniform construction: the number of imposable forfeitures in each case under

the first clause is keyed to the number of false claims submitted.[6]   The language further suggests an interpretation in terms of traditional concepts of causation. Such concepts, whether denominated "proximate cause" or "legal" cause, frequently result in the imposition of liability even upon a *negligent* actor for consequences of which he could not have been absolutely certain at the time he acted, so long as those consequences might reasonably have been foreseen.   See W. Prosser, The Law of Torts §§ 42, 43 (4th ed. 1971); Restatement (Second) of Torts § 435 (1965).   I would remand this case to the District Court for assessment of forfeiture liability under this standard.

There may well be room for inference on the part of the trier of fact in this case, if not on the present record, on such additional record as could be compiled on remand, that respondent subcontractor knew or had reason to believe that the prime contractor would assemble and forward finished products to the Government at routine and regular intervals.   Nor would it be unforeseeable under such a set of circumstances that the prime contractor would regularly invoice the Government for the customary progress payments.   I am unwilling to accept the flat conclusion that it was "wholly beyond" the subcontractor's ability to foresee that 35 false claims would be generated by his fraud.   Evidence such as the terms of the prime contract, and the subcontract, the sub-

---

[6] This is in contrast, however, with the second and third clauses of § 5438, which also go to nonmilitary persons.   The number of imposable forfeitures in the second clause appears to turn on the number of false bills, certificates, affidavits, etc., made or used, or caused to be made or used, "for the purpose of obtaining . . . the payment or approval" of a false claim.   The act prohibited by the third clause is the entry into a conspiracy to defraud the Government by obtaining the payment of a false claim.   See text quoted, *ante,* at 306 n. 1.

contractor's experience in business generally and in Government procurement particularly, and the closeness of the working relationship between the subcontractor and the prime contractor could well be relevant to such an inquiry. But the fact that the subcontractor loses "control" over the actual number of false claims his actions have caused to be submitted to the Government, once the prime contractor has been tricked into paying for fraudulent goods, cannot be of controlling significance if he could have foreseen the number or even the order of magnitude of the claims which would be ultimately submitted by the prime contractor. Given a statute which punishes intentional deception, deception which is abundantly made out on this record, I cannot agree with the Court's sharply restricted test for determining the number of forfeitures for which these respondents are liable.