THOMAS D. SCHROEDER, Chief District Judge.
This matter is before the court on what Plaintiffs LaTia and Octavia Harris style as a motion for summary judgment against Defendant Blue Ridge Health Services, Inc. ("Blue Ridge"), pursuant to Federal Rule of Civil Procedure 56. (Doc. 22.) Because Plaintiffs base their motion on facts established by the entry of default against Blue Ridge, the court construes their filing as a motion for default judgment pursuant to Rule 55. See Auto-Owners Ins. Co. v. Rippy, No. 4:18-cv-02698-RBH, 2019 WL 122922 (D.S.C. Jan. 7, 2019) (construing motion for summary judgment filed after entry of default as motion for default judgment); Phillips Factors Corp. v. Harbor Lane of Pensacola, Inc., 648 F. Supp. 1580, 1583 (M.D.N.C. 1986) (finding that [s]ummary judgment would be an inapt procedural vehicle" where the "issues have not been actually litigated but established by default," and that "the appropriate procedure for plaintiff to follow is a default judgment pursuant to Fed. R. Civ. P. 55(b)(2)").
For the reasons that follow, the motion will be granted as to Plaintiffs' claims under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h)(1), the North Carolina Medical Assistance Provider False Claims Act ("NCFCA"), N.C. Gen. Stat. § 108A-70.15, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-240 et seq. The motion will be denied as to Plaintiffs' claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
I. BACKGROUND
The basic facts alleged in the complaint are as follows: Plaintiffs, who were both formerly employed by Blue Ridge, are a same-sex married couple. (Doc. 1 ¶¶ 9, 12, 14.) LaTia began working at Blue Ridge on December 14, 2013, and Octavia began on August 29, 2015. (Id. ¶¶ 9, 12.) While working at Blue Ridge, Plaintiffs became aware that Blue Ridge was submitting reimbursement claims to Medicaid while out of compliance with Medicaid requirements.
*637 (Id. ¶¶ 17-18, 25, 34). Plaintiffs made multiple attempts to bring Blue Ridge into compliance, including notifying their supervisor, Lynn Taylor, and Blue Ridge's owner, Lubna Reece, of the compliance issues, as well as contacting "Sandhills Center, the Local Management Entity-Managed Care Organization above [Blue Ridge], to talk about [Blue Ridge]'s compliance issues and how to fix them." (Id. ¶¶ 19-21, 34.) Taylor resisted Plaintiffs' attempts to remedy Blue Ridge's noncompliance and - after Plaintiffs went over her head to discuss the noncompliance issues with Reece - began openly expressing hostility towards Plaintiffs, including telling Octavia "that she would not forgive [Octavia] for telling Reece about their noncompliance issues and that the best thing Octavia could do would be to find another job." (Id. ¶¶ 22, 33, 41.)
Blue Ridge also failed to pay Plaintiffs the legally required overtime wage for overtime work. (Id. ¶¶ 43-44, 65.) When Plaintiffs complained about this to Taylor, she told Octavia "that she needed to get on board or find another job" and that any employee "who did not like it could 'kick rocks.' " (Id. ¶¶ 51-53.) Finally, Taylor told Octavia that Reece "was not comfortable with gay people" and that Plaintiffs should keep quiet about their marriage in order to avoid a confrontation with Reece. (Id. ¶¶ 11-13.) When Reece eventually found about Plaintiffs' sexual orientation, she gave Octavia a copy of the Quran and told her that "same sex marriage is not in God's will," but that she "would pray about it and hope it all worked out." (Id. ¶¶ 37-38.) On November 4, 2016, Reece "expressed that if she had it her way she never would have hired [Plaintiffs] in the first place because she disapproved of their being gay." (Id. ¶ 63.)
Later that day, Plaintiffs were fired. (Id. ¶ 64.) After receiving right-to-sue letters from the EEOC and the North Carolina Department of Labor, Plaintiffs instituted this action against Blue Ridge. (Id. ¶¶ 67-70.) Blue Ridge never answered, and the Clerk of Court entered default at Plaintiffs' behest. (Doc. 6.) Plaintiffs then moved for default judgment (Doc. 7); however, the court denied the motion and set aside the default because Plaintiffs did not properly serve Blue Ridge. (Doc. 9.) The court extended the time for service to be made, and Plaintiffs timely re-attempted service. (Docs. 17, 18.) The Clerk then re-entered default (Doc. 20), and Plaintiffs filed the instant motion. (Doc. 22.) Blue Ridge's response was struck by the Magistrate Judge because it lacked an original signature as required under Federal Rule of Civil Procedure 11(a) and because, as a corporation, Blue Ridge may only appear through an attorney, see Local Civil Rule 11.1(a). (Doc. 27.) Blue Ridge was provided time in which to file a corrected response, but it did not do so. On June 17, 2019, the court held a hearing on the motion and requested supplemental briefing from Plaintiffs. Blue Ridge did not appear at the hearing. Plaintiff timely filed the requested supplement, and the motion is now ripe for decision.
II. ANALYSIS
When a "motion for default judgment is unopposed, the court must exercise sound judicial discretion to determine whether default judgement should be entered." United States v. Williams, No. 1:17-cv-00278, 2017 WL 3700901, at *1 (M.D.N.C. Aug. 25, 2017) (internal quotation marks omitted). "Upon the entry of default, the defaulted party is deemed to have admitted all well-pleaded allegations of fact contained in the complaint." J & J Sports Prods., Inc. v. Romenski, 845 F. Supp. 2d 703, 705 (W.D.N.C. 2012). "However, the defendant is not deemed to have admitted conclusions of law ...." Id. The *638 party moving for default judgment must still show that the defaulted party was properly served, Md. State Firemen's Ass'n v. Chaves, 166 F.R.D. 353, 354 (D. Md. 1996), and that the "unchallenged factual allegations constitute a legitimate cause of action," Agora Fin., LLC v. Samler, 725 F. Supp. 2d 491, 494 (D. Md. 2010) ; see Romenski, 845 F. Supp. 2d at 705 (default judgment is proper when "the well-pleaded allegations in the complaint support the relief sought"). Finally, "[i]f the court determines that liability is established, the court must then determine the appropriate amount of damages. The court does not accept factual allegations regarding damages as true, but rather must make an independent determination regarding such allegations." Samler, 725 F. Supp. 2d at 494 (citation omitted).
A. Service of Process
Federal Rule of Civil Procedure 4(h)(1)(A) allows service on a corporation consistent with Rule 4(e)(1), which permits service that "follow[s] state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." The relevant North Carolina statute allows service on a corporation by, among other ways, "mailing a copy of the summons and of the complaint, registered or certified mail, return receipt requested, addressed to the officer, director or agent to be served." N.C. Gen. Stat. § 1A-1, Rule 4(j)(6)(c).
In this case, "Plaintiffs have provided evidence that they have served the Defendant by serving its registered agent, Gregory S. Williams, via certified mail, return receipt [requested]." (Doc. 18 at 1.) Plaintiffs properly addressed the certified mail to the registered agent at the agent's mailing address as maintained on the North Carolina Secretary of State's website. See (Doc. 17-1); Business Corporation Page for Blue Ridge Health Services, Inc., Secretary of State: Elaine F. Marshall, https://www.sosnc.gov/online_services/search/by_title/_Business_Registration (last visited June 21, 2019) (search "Blue Ridge Health Services, Inc." and follow the hyperlink). Although the mail was undeliverable at that address, the United States Postal Service delivered it to the forwarding address associated with the original address, where it was received and signed for. (Docs. 17, 17-1, 17-2, 17-3.) The forwarding appears to have been effective, as Blue Ridge attempted to make its first filing in the case thereafter in the form of a response (Doc. 25) to Plaintiffs' dispositive motion, although - as previously noted - the response was later struck as deficient by the Magistrate Judge. (Doc. 27.) On this record, it appears that Plaintiffs have properly served Blue Ridge.
B. Liability
Plaintiffs allege five causes of action. Each is addressed in turn.
1. False Claims Act
As to Plaintiffs' FCA claim, the statute provides that an employee
shall be entitled to all relief necessary to make that employee ... whole, if that employee ... is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee ... or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.
31 U.S.C. § 3730(h)(1). In the absence of direct evidence of retaliatory intent, the court applies the burden-shifting framework set out in *639 McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[1] Under that framework, Plaintiffs must first make out a prima facie case composed of three elements: (1) they engaged in a protected activity, (2) the employer knew about the activity, and (3) the employer took adverse action against them as a result. Nifong v. SOC, LLC, 234 F. Supp. 3d 739, 752 (E.D. Va. 2017).
Here, Plaintiffs' undisputed allegations show that they attempted to remedy Blue Ridge's lack of compliance with Medicaid requirements and that Blue Ridge was well aware of these efforts. See, e.g., (Doc. 1 ¶¶ 17-18, 25-29, 31-32, 34, 66). Because submission of Medicaid claims without disclosing lack of compliance with Medicaid requirements can be a violation of the FCA, see Universal Health Services, Inc. v. United States, --- U.S. ----, 136 S. Ct. 1989, 195 L.Ed.2d 348 (2016), Plaintiffs' efforts constitute protected activities under the FCA. Finally, Taylor's comment to the effect "that she would not forgive [Octavia] for telling Reece about their noncompliance issues and that the best thing Octavia could do would be to find another job" (Doc. 1 ¶ 41), along with the temporal proximity of Plaintiffs' firing to an incident between Octavia and Taylor regarding Blue Ridge's noncompliance with Medicaid requirements, suffice to make out a prima facie case that Plaintiffs were fired because they engaged in a protected activity, see Jefferies v. UNC Reg'l Physicians Pediatrics, 320 F. Supp. 3d 757, 761 (M.D.N.C. 2018) ("[A] plaintiff can allege a causal link through temporal proximity, provided that an employer's knowledge of protected activity and the adverse employment action that follows are closely related in time."); (Doc. 1 ¶¶ 56-59, 61, 64).[2]
Because Plaintiffs have pleaded facts sufficient to make out a prima facie case under the McDonnell Douglas framework, the burden shifts to Blue Ridge "to produce evidence of a legitimate, non-retaliatory reason for the adverse action." Nifong, 234 F. Supp. 3d at 752. By virtue of Blue Ridge's failure to make any proper filing in this case, it has produced no reason at all for firing Plaintiffs, let alone a legitimate, non-retaliatory one. As a result, the court will grant default judgment to Plaintiffs on their FCA claim.
2. North Carolina Medical Assistance Provider False Claims Act
As to Plaintiffs' NCFCA claim, the statute provides:
Any employee of a provider who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by the employee's employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under G.S. 108A-70.12, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under G.S. 108A-70.12, shall be entitled to all relief necessary to make the employee whole.
*640 N.C. Gen. Stat. § 108A-70.15(b). Section 108A-70.12 makes it unlawful for North Carolina Medical Assistance Program[3] healthcare providers to
(1) Knowingly present, or cause to be presented to the Medical Assistance Program a false or fraudulent claim for payment or approval; or (2) Knowingly make, use, or cause to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Medical Assistance Program.
Id. § 108A-70.12(a). Plaintiffs do not cite any case applying these provisions, and the court has not readily located any. "Where an issue relative to a state statute has not been addressed by that state's courts, the federal court must exercise its independent judgment as to how the state supreme court would resolve that issue." Armentrout's Estate v. Int'l Harvester Co., 547 F. Supp. 136, 137 (W.D. Va. 1982).
While it is not certain that the North Carolina Supreme Court would apply the McDonnell Douglas framework to NCFCA retaliation claims, "state courts often look to federal decisions for guidance in ruling on cases of first impression arising under state law, particularly in the area of employment discrimination," Dantzler v. Nationwide Credit, Inc., No. 1:98CV00837, 1999 WL 1939258, at *6 (M.D.N.C. Feb. 17, 1999). Here, the relevant provisions of the FCA and NCFCA are textually similar. Moreover, North Carolina courts have already adopted the McDonnell Douglas framework in other retaliatory employment discrimination contexts. See Pierce v. Atl. Grp., Inc., 219 N.C.App. 19, 724 S.E.2d 568, 573 (2012) (applying the framework to a REDA claim). As a result, it is the court's best judgment that the North Carolina Supreme Court would require that plaintiffs bringing claims under section 108A-70.15 make the same showing required for FCA retaliation claims, including - when applicable - the McDonnell Douglas burden-shifting framework.
In the circumstances of this case, Plaintiffs have pleaded facts sufficient to support a claim under the NCFCA for the same reasons discussed in the FCA analysis above. As a result, the court will grant default judgment to Plaintiffs on their NCFCA claim.
3. North Carolina Retaliatory Employment Discrimination Act
As to Plaintiffs' REDA claim, the statute provides:
No person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to ... [f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to ... Article 2A ... of this Chapter.
N.C. Gen. Stat. § 95-241(a)(1)(b). Article 2A of that Chapter is the North Carolina Wage and Hour Act, which includes a provision setting the minimum overtime wage rate at "not less than time and one half of *641 the regular rate of pay of the employee for those hours in excess of 40 per week." Id. § 95-25.4(a). In order to bring a REDA claim, an employee must first receive a right-to-sue letter from the North Carolina Department of Labor and must file a lawsuit within 90 days of the issuance of the letter. Johnson v. North Carolina, 905 F. Supp. 2d 712, 727-28 (W.D.N.C. 2012). Next, to make out a prima facie case, the employee must show "(1) that [s]he exercised [her] rights as listed under [ section] 95-241(a), (2) that [s]he suffered an adverse employment action, and (3) that the alleged retaliatory action was taken because the employee exercised [her] rights under [ section] 95-241(a)." Pierce, 724 S.E.2d at 573. An employee's exercise of rights under section 95-241(a) must include more than merely complaining to a manager, but it need not include the filing of any sort of formal claim. Id. at 574-75.
In this case, the undisputed allegations of the complaint support all these elements. Plaintiffs' right-to-sue letter was issued on February 2, 2018, and their lawsuit was timely filed on February 19, 2018. (Doc. 1 ¶¶ 69-70.) Blue Ridge failed to pay Plaintiffs the proper overtime wage under the Wage and Hour Act. (Id. ¶¶ 23, 30, 35, 43-46.) Plaintiffs' internal reporting of the Wage and Hour Act violations went all the way up to Reece, Blue Ridge's owner, and Octavia also contacted a third party - the North Carolina Department of Labor - about the practice. (Doc. 1 ¶¶ 35, 43-46.) Plaintiffs clearly suffered an adverse employment action when they were fired. (Id. ¶ 64.) Finally, Plaintiffs' firing took place less than two weeks after an episode in which Octavia reiterated to Taylor that Blue Ridge's overtime wage policy was illegal, only to be told to "get on board or find another job." (Id. ¶¶ 51-54.) Because temporal proximity between a protected activity and an adverse employment action "is sufficient to make a prima facie case of causality" under REDA, Fatta v. M & M Props. Mgmt., Inc., 221 N.C.App. 369, 727 S.E.2d 595, 599 (2012) (quoting Shoaf v. Kimberly-Clark Corp., 294 F. Supp. 2d 746, 756 (M.D.N.C. 2003) ), Plaintiffs have satisfied their prima facie burden. Once again, the burden shifts to Blue Ridge to provide a legitimate, non-retaliatory reason for firing Plaintiffs. Id. And once again, by virtue of its failure to make any proper filings in this case, Blue Ridge has not met its burden.
As a result, the court will grant default judgment to Plaintiffs on their REDA claim.
4. Fair Labor Standards Act
As to Plaintiffs' FLSA claim, the statute provides that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Moreover, the FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3).
In the FLSA context, a plaintiff must make out the same prima facie case required in the REDA context: that "(1) [s]he engaged in an activity protected by the FLSA; (2) [s]he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action." Darveau v. Detecon, Inc., 515 F.3d 334, 340 (4th Cir. 2008). As for what constitutes protected activity under the FLSA retaliation provision, *642 the Fourth Circuit has held that mere "intracompany complaints" qualify. Minor v. Bostwick Labs., Inc., 669 F.3d 428, 438 (4th Cir. 2012). In the circumstances of this case, Plaintiffs have pleaded facts sufficient to support a claim under the FLSA for the same reasons discussed in the REDA analysis above.
As a result, the court will grant default judgment to Plaintiffs on their FLSA claim.
5. Title VII
As to Plaintiffs' Title VII claim, the statute provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Plaintiffs claim that they were terminated because of their "sexual orientation." (Doc. 1 ¶ 86.) However, "[i]t is explicitly the law of the Fourth Circuit that Title VII does not protect against discrimination based on sexual orientation." Hinton v. Va. Union Univ., 185 F. Supp. 3d 807, 814 (E.D. Va. 2016) ; see Wrightson v. Pizza Hut of Am., Inc., 99 F.3d 138, 143 (4th Cir. 1996) (noting, in dicta, that "Title VII does not afford a cause of action for discrimination based upon sexual orientation"); Murray v. N.C. Dep't of Pub. Safety, 611 F. App'x 166 (4th Cir. 2015) (unpublished) (citing Wrightson as "recognizing that Title VII does not protect against sexual orientation discrimination"). No court in the Fourth Circuit has recognized such a cause of action, as this court has held. See Fenner v. Durham Cty. Det. Ctr., No. 1:10CV369, 2010 WL 4537850, at *2 (M.D.N.C. Nov. 3, 2010) ("Title VII does not apply to claims of employment discrimination based on ... sexual orientation." (internal quotation marks omitted)), adopted by No. 1:10CV369 (Doc. 8) (M.D.N.C. Dec. 1, 2010).
As a result, Plaintiffs have not demonstrated entitlement to default judgment on their Title VII claim.
C. Damages
Recognizing that they have an election of remedies and their damages claims are largest under the FCA and REDA, Plaintiffs focus their request for damages on whichever of the two theories provides the greatest award. (Doc. 23 at 18-20.) The court will therefore limit its damages analysis to these two bases for liability.
Relief under the FCA's retaliation provision "shall include ... 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. § 3730(h)(2). Relief under REDA may include "[c]ompensation for lost wages, lost benefits, and other economic losses that were proximately caused by the retaliatory action or discrimination," and this relief is trebled if the employee shows that the employer's violation was willful. N.C. Gen. Stat. § 95-243(c)(4).[4] REDA also provides that "[t]he court may award to the plaintiff and assess against the defendant the reasonable costs and expenses, including attorneys' fees, of the plaintiff in bringing an action pursuant to this section." Id. § 95-243(c).
As previously indicated, "[t]he court does not accept factual allegations regarding damages as true, but rather must make an independent determination regarding *643 such allegations." Samler, 725 F. Supp. 2d at 494 (citation omitted); see Fed. R. Civ. P. 8(b)(6) ("An allegation - other than one relating to the amount of damages - is admitted if a responsive pleading is required and the allegation is not denied."). Plaintiffs have provided evidence as to damages in the form of affidavits.
As to whether Blue Ridge's REDA violations were willful, Plaintiffs' affidavits affirm the complaint's allegations that Plaintiffs repeatedly informed Blue Ridge of its overtime wage obligations and violations over period of months, yet they were met with indifference or outright hostility each time. See, e.g., (Doc. 1 ¶¶ 23-24, 30, 35, 51-54). Under the circumstances of this case, the court finds that Blue Ridge violated REDA willfully, and therefore that any damages awarded under REDA will be trebled pursuant to N.C. Gen. Stat. § 95-243(c). See Morris v. Scenera Research, LLC, 368 N.C. 857, 788 S.E.2d 154, 160-61 (2016) (a willful REDA violation occurs where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute" (internal quotation marks and brackets omitted)).
As to back pay, Plaintiffs' evidence is that LaTia was paid $13 per hour for office work, $12 per hour for rehabilitation technician work, and $10.50 per hour for personal care and respite work. (Doc. 23-3 ¶ 6.) She worked 43 hours per week in the office and averaged around 12 hours of work per weekend, of which about 3 hours were for rehabilitation technician work and 9 hours were for personal care and respite work. (Id. ¶¶ 7-10.) Including the overtime rate, where applicable, LaTia's approximate weekly pay was therefore $709. Octavia was paid $13 per hour and worked 43 hours per week. (Doc. 23-2 ¶ 5.) Her approximate weekly pay was therefore $578.50. Plaintiffs were terminated on November 4, 2016, and Blue Ridge was dissolved approximately 85 weeks later, on June 19, 2018.[5] (Doc. 30 at 1.) Multiplying Plaintiffs' weekly rates by 85 produces an initial total of $60,265 for LaTia and $49,172.50 for Octavia. However, Plaintiffs mitigated their damages to some extent by finding other work during the 85-week period: LaTia earned $29,010.75 and Octavia earned $23,521.97. (Docs. 23-2, 23-3, 30.)
This brings the court to a legal issue: should the initial back pay amounts be doubled (under the FCA) or trebled (under REDA) before subtracting the mitigation amounts, or afterwards? Plaintiffs argue for the former, citing U.S. ex rel. Mooney v. Americare, Inc., 172 F. Supp. 3d 644 (E.D.N.Y. 2016) in support. The court's research shows a split among the handful of courts to have considered the question in the FCA context. Compare id. at 646 (doubling first, then applying mitigation offset), and Neal v. Honeywell, Inc., 995 F. Supp. 889, 896 (N.D. Ill. 1998) (same), with Hammond v. Northland Counseling Ctr., Inc., 218 F.3d 886, 891-92 (8th Cir. 2000) (rejecting Neal's approach);
*644 Miniex v. Houston Hous. Auth., No. 4:17-00624, 2019 WL 1675857, at *3 (S.D. Tex. April 17, 2019) (applying mitigation offset first, then doubling). Plaintiffs do not provide any cases considering this question in the REDA context.
As to FCA mitigation, the court finds the reasoning of Hammond and Miniex more persuasive than that of Mooney and Neal.[6] The concept of back pay was "designed to put the employee 'in the same position [she] would have been had the violation never occurred,' " Miniex, 2019 WL 1675857, at *2 (quoting Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc., 15 F.3d 1275, 1283 (5th Cir. 1994) ), and thus the term "back pay" is properly understood to refer to the amount of wages Plaintiffs should have received but did not actually receive. The FCA's command that prevailing plaintiffs receive "2 times the amount of back pay," then, refers to net back pay. 31 U.S.C. § 3730(h)(2). Plaintiffs' contrary reading "would award damages for an injury that in fact never occurred and thus would give [Plaintiffs] a windfall, rather than compensation." Hammond, 218 F.3d at 892. That result would be out of step with the purpose of FCA retaliation remedies, which is to "make th[e] employee ... whole." 31 U.S.C. § 3750(h)(1).
As to REDA mitigation, Plaintiffs provide no argument or authority whatsoever for their request that the initial back pay calculation be trebled before applying mitigation. In the only North Carolina case this court found on the issue - albeit in the context of a reduction in damages for failure to mitigate - neither the parties nor the court took Plaintiffs' view. See Morris v. Scenera Research, LLC, No. 09 CVS 19678, 2012 WL 1720672, at *8 (N.C. Super. Ct. May 14, 2012) ("[Plaintiff] concedes that the amount potentially subject to trebling is $390,000, which is the $540,000 damages award less the $150,000 amount to be deducted for failure to mitigate damages."), rev'd in part on other grounds, 229 N.C.App. 31, 747 S.E.2d 362 (2013), rev'd in part on other grounds, 368 N.C. 857, 788 S.E.2d 154 (2016). Moreover, Plaintiffs' reading is a poor fit with the statutory text, which states that "the court shall treble the amount awarded." N.C. Gen. Stat. § 95-243(c) (emphasis added). The initial, unmitigated back pay amount would never be the amount actually "awarded," and therefore it cannot be that amount that is trebled. With these considerations in mind, the court will apply the mitigation offset prior to trebling Plaintiffs' REDA damages.
One issue remains before the court can calculate and compare damages amounts under the FCA and REDA: the amount of emotional distress damages Plaintiffs should be awarded under the FCA. See Jones v. Southpeak Interactive Corp., 777 F.3d 658, 672 (4th Cir. 2015) ("Every federal circuit court to have addressed the issue has concluded that the False Claims Act affords noneconomic compensatory damages." (internal quotation marks omitted)); Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd., 277 F.3d 936, 944 (7th Cir. 2002) (finding that the FCA retaliation remedy provision "permits recovery for emotional distress"). Plaintiffs cite a *645 case from the Eastern District of New York for the proposition that "[g]arden variety emotional distress claims generally merit $30,000 to $125,000 awards," Olsen v. Cty. of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (internal quotation marks omitted), and baldly state that their affidavits show that they "both suffered emotional distress on the upper end of garden variety." (Doc. 23 at 19.) This request has a number of problems. First, Plaintiffs have not explained why a case expressly discussing "[e]motional distress awards within the Second Circuit" is an appropriate guideline for claims brought in the Middle District of North Carolina. Second, even if the court were to borrow its damages framework from the Eastern District of New York, Plaintiffs fail to acknowledge that other cases from that district provide a much lower damages range. See, e.g., Moore v. Houlihan's Rest., Inc., No. 07-CV-03129(ENV)(RER), 2011 WL 2470023, at *6 (E.D.N.Y. May 10, 2011) ("Plaintiffs with garden variety claims generally receive between $5,000 and $35,000."). Third, Plaintiffs have not provided any reasoned basis for their assertion that they "suffered emotional distress on the upper end of garden variety."
The Fourth Circuit has stated that "[a]n award of compensatory emotional distress damages requires evidence establishing that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a violation occurred supports an award of compensatory damages." Doe v. Chao, 306 F.3d 170, 180 (4th Cir. 2002) (internal quotation marks, brackets, and ellipses omitted). "A plaintiff's own conclusory allegations that he felt embarrassed, degraded, or devastated ... will not suffice ...." Id. (internal quotation marks omitted). "In determining whether sufficient evidence exists to support an award of more than nominal damages for emotional distress," the Fourth Circuit "examine[s] factors such as the need for medical, psychological, or psychiatric treatment, the presence of physical symptoms, loss of income, and impact on the plaintiff's conduct and lifestyle." Id.
In the court's view, Plaintiffs' brief testimony in this case regarding "feelings of hopelessness" and marital "strain" is only barely sufficient to make out a non-conclusory case for emotional distress damages and is certainly nowhere close to sort of concrete evidence that would be necessary to support the large awards that Plaintiffs request. (Doc. 23-2 ¶¶ 10-15, Doc. 23-3 ¶¶ 16-20.) Consequently, the court will award Plaintiffs $5,000 apiece in emotional distress damages.
This resolved, the court may finally calculate and compare Plaintiffs' damages under the FCA and REDA. As previously noted, Plaintiffs request an award under whichever of these statutes provides the greatest recovery. To calculate LaTia's FCA damages award, the court starts with her initial back pay amount of $60,265, subtracts her mitigation amount of $29,010.75, and doubles the result, equaling $62,508.50. The court then adds the $5,000 emotional distress award, equaling $67,508.50. For Octavia, the court starts with her initial back pay amount of $49,172.50, subtracts her mitigation amount of $23,521.97, and doubles the result, equaling $51,301.06. With the emotional distress award, Octavia's FCA total is 56,301.06. Plaintiffs' REDA damages awards are three times their post-mitigation back pay figures. For LaTia, this equals $93,762.75. For Octavia, it equals $76,951.59. In both contexts, Plaintiffs would receive pre-judgment interest at the rate of 8% per annum on the back pay and *646 post-judgment interest at the federal rate on the total sums.[7]
Therefore, because the REDA award exceeds the FCA award, and because Plaintiffs have specifically requested judgment based on the theory of recovery that produces the larger amount to be awarded (Doc. 23 at 21), the court will grant Plaintiffs relief under REDA.
III. CONCLUSION
For the reasons stated,
IT IS THEREFORE ORDERED that:
(1) Plaintiffs' motion for summary judgment (Doc. 22), construed as a motion for default judgment, is GRANTED, and Plaintiff LaTia Harris shall have and recover of Blue Ridge $93,762.75, plus pre-judgment interest at 8% per annum and post-judgment interest at the federal rate, and Plaintiff Octavia Harris shall have and recover of Blue Ridge $76,951.59, plus pre-judgment interest at 8% per annum and post-judgment interest at the federal rate.
(2) Plaintiffs shall be awarded costs as prevailing parties.
(3) Plaintiffs, as prevailing parties, may file an appropriate motion for attorneys' fees and costs pursuant to Local Civil Rule 54.2. Given Blue Ridge's default, counsel is excused from the Local Rule's requirement that the parties attempt to reach an agreement on the proper fee award. However, counsel should comply with the remainder of Local Rule 54.2 by filing any motion for attorneys' fees within 60 days and supporting it with "affidavits, time records, or other evidence, setting forth the factual basis for each criterion which the Court will consider in making such an award" under the applicable law. As to costs, counsel should similarly comply with Local Rule 54.1. To the extent counsel in his affidavit requests in camera review of his fee documentation rather than filing it in compliance with the Local Rules (Doc. 23-1 ¶ 5), the request is denied, but counsel is free to edit his fee documentation prior to submission if necessary to preserve any applicable privilege.

"Although the Fourth Circuit has not explicitly held that the McDonnell Douglas burden-shifting framework applies in FCA retaliation cases, there is little doubt that the framework applies there as the Fourth Circuit has applied the framework in similar contexts, including retaliation claims under Title VII. Moreover, other circuits and district courts in this circuit have routinely applied the framework to FCA retaliation claims." U.S. ex rel. Bachert v. Triple Canopy, Inc., 321 F. Supp. 3d 613, 622 n.5 (E.D. Va. 2018) (citation omitted).

Although Taylor primarily communicated with Octavia, LaTia also participated in noncompliance reporting that angered Taylor; moreover, the FCA prohibits not only discharge of an employee for her own protected acts, but also for the protected acts of "associated others," 31 U.S.C. § 3730(h)(1).

" 'Medical Assistance Program' means the North Carolina Division of Medical Assistance and its fiscal agent." N.C. Gen. Stat. § 108A-70.11(5). The Division of Medical Assistance has traditionally been "responsible for administering the State's Medicaid program," Charlotte-Mecklenburg Hosp. Auth. v. N.C. Dep't of Health & Human Servs., 201 N.C.App. 70, 685 S.E.2d 562, 564 (2009), although within the last year it has been combined with (and renamed) the North Carolina Division of Health Benefits, see Division of Medical Assistance (DMA) is Now the Division of Health Benefits (DHB), NCDHHS (Sept. 3, 2018), https://medicaid.ncdhhs.gov/blog/2018/09/03/division-medical-assistance-dma-now-division-health-benefits-dhb.

Ordinarily, employees may also be reinstated under either statute; however, because Blue Ridge has been dissolved, this remedy is unavailable.

Plaintiffs originally provided a back pay period running from the time of their termination to the time they filed the instant motion. See (Doc. 23-2 ¶ 6; Doc. 23-3 ¶ 12). However, because "the underlying premise for awarding back pay is that, absent the employer's unlawful conduct, the employee would have remained in the specified position at the designated rate of pay," Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 2771 (4th ed. 2007), the court finds that the appropriate end date for the back pay period is the date Blue Ridge was dissolved - after which date Blue Ridge could not possibly have employed Plaintiffs. Cf. E.E.O.C. v. Regency Architectural Metals Corp., 896 F. Supp. 260, 271 (D. Conn. 1995) (finding, in the Title VII employment discrimination context, that "the cut off point for recovering back pay is ... when the shop where [the employee] was working went out of business").

Neal provides essentially no reasoning on this point, instead simply providing the calculation. 995 F. Supp. at 896 ("The jury concluded that Neal was entitled to $50,000 in back pay less $10,000 earned in mitigation. Under the statute we double that $50,000 and subtract $10,000 for a beginning figure of $90,000."). Mooney relies entirely on the Supreme Court's decision in United States v. Bornstein, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), but that decision is distinguishable for the reasons explained in Hammond and Miniex.

District courts generally have discretion in choosing a pre-judgment interest rate, including "choos[ing] to apply the interest rate provided for by state law." E.E.O.C. v. Liggett & Myers Inc., 690 F.2d 1072, 1074 (4th Cir. 1982). Here, the court finds the North Carolina legal rate of 8% per annum appropriate. See N.C. Gen. Stat. § 24-1.